## SALE OF COLLATERAL BY BANK HOLDING NOTE FOR COLLECTION.

Circuit Court of Cuyahoga County.

EDWARD W. MOORE v. THE CENTRAL NATIONAL BANK OF CLEVELAND.

Decided, February 7, 1910.

*Promissory Note Secured by Collateral—Sale of the Collateral to Itself —By Bank to which the Note had been Sent for Collection—Bank Held for Value of the Collateral above Amount Due on the Note— Meaning of the Word "Holder"—Notice to Owner—Agency—Trust Relation—Consent of Owner to Purported Sale—Statute of Limitations.*

1. A bank having in its possession a promissory note for collection is not the "holder" of the note.

2. The rule that a pledgee of securities can not become the purchaser thereof either at a public or private sale, except where authority so to do has been expressly conferred, is a bar to the purchase of such securities by a bank which received for collection the note to which the securities were attached, where the note authorizes the "holders" thereof in the event of default of payment at maturity to sell the securities in whole or in part with the right reserved to the holder to become the purchaser and absolute owner thereof, free of all trusts and claims.

3. The maker of a note, which was not paid at maturity, can not be held to have been given notice of the sale of the securities pledged for its payment by the mere return to him of the canceled note, where it appears that he had requested the bank to pay the note for him and retain the securities for its own protection, notwithstanding the bank declined so to do at the time the request was made.

4. Moreover the bank may be said on principles of equity to have held the stock as trustee for the maker of the note, and therefore not liable for conversion of the securities until such time as it actually parted with them by sale, or gave notice to the maker that it claimed to hold the stock as its own and denied that he had any right to it in the absence of a contract with respect thereto.

5. In such a case, failure of the maker to claim the stock, or to protest against its being held by the bank, did not amount to consent on his part to the purported sale, and the statute of limitations did not begin to run against him until he received notice from the bank of its claim of ownership under the purchase.

*Kline, Tolles & Morley,* for plaintiff.

*Hoyt, Dustin, Kelley, McKeehan & Andrews,* contra.

MARVIN, J.; HENRY, J., concurs; WINCH, J., not sitting.

Heard on appeal.

The plaintiff brings his action against the defendant, which is a banking institution, organized under the laws of the United States, and doing business in the city of Cleveland, state of Ohio, praying that certain certificates of stock of the Detroit United Railways Company, which he once owned and were afterwards in the hands of the defendant, may be delivered to the plaintiff upon his paying to the defendant such sum of money as the court shall find is owing by the plaintiff to the defendant; that an accounting may be had of the dividends received by the defendant on said stock while in its hands, and that if it shall be found that the defendant has disposed of said stock, then that an accounting may be taken to include whatever may have been received by the defendant for said stock, and that the plaintiff may recover whatever the amount received in dividends and upon the sale of said stock shall exceed the indebtedness of the plaintiff to the defendant.

The following facts we find established:

Prior to December 20, 1901, the plaintiff was indebted to the defendant in the sum of $78,000, and also prior to said 20th of December, 1901, the plaintiff was indebted to the Industrial Trust Company, a banking institution of Philadelphia, Pa., in the sum of $25,000, for which the last named company held the plaintiff's note, and as collateral security for the payment thereof held the certificates of stock which are the foundation of the present action, and which certificates were the property of this plaintiff. The par value of said stock was $50,000. On said 20th of December, 1901, the trust company sent to the defendant the said note, in the city of Cleveland, Ohio, where the plaintiff then resided, for collection, and at the same time sent with the note the said collateral. The $25,000 note became due on said date and the defendant immediately notified the plaintiff that said note was in its hands for collection, and that it also had in its hands said collateral. The plaintiff answered that he was unable to pay the note that day or the next, but would arrange

it very shortly.  Before the 31st day of December, 1901, the plaintiff received notice more than once, after the notice first mentioned, that the note was in the hands of the defendant for collection and must be paid.  No payment, however, was made by the plaintiff on the note, and on the 31st day of December, 1901, the defendant notified the plaintiff that the note must be paid at once, or that the collateral would be sold.  The note referred to contained the following provisions:

"I ——————— upon default of payment at maturity —— ——— do hereby authorize and empower the holders hereof, for the purpose of liquidation of said note, and of all interest and costs thereon, to sell, transfer and deliver the whole or any part of such security (being the 500 shares of Detroit United Railways Company stock) without any previous demand,, advertisement or notice, either at broker's board or at private sale, at any time or times thereafter, with the right on the part of such holders to become purchasers and absolute owners thereof, free of all trusts and claims."

On the afternoon of said 31st day of December, at the close of banking hours, the defendant, without any notice to anybody, in front of its place of business on Superior avenue, in the city of Cleveland, announced that the said five hundred shares of stock was now offered for sale to the highest bidder.  Nobody paid any attention to said announcement except the officers or employes of the defendant.  The attorney of the defendant made the announcement and the offer of sale, and the defendant bid for said stock the sum of $25,050, being the exact amount that day owing upon the note already mentioned.  No other bid was made and the attorney who had offered the stock for sale, announced that it was sold to the defendant.  The next day being the 1st of January, and a holiday, no entry of the transaction was made on the books of the defendant, but on the 2d of January an entry was made that the stock was sold to the defendant at private sale, and thereupon the defendant remitted to the trust company in Philadelphia the amount then due upon its note, being the amount for which said stock was so purported to be sold.

Prior to the 31st of December, aforesaid, the plaintiff had stated to the defendant, what was true, that he was laboring under great financial embarrassment; that payment on notes held

against him by various parties was being demanded; that his assets were largely in excess of his liabilities, but that he was unable to convert such assets at once into money, and therefore unable to pay his obligations as they became due; that another bank in the city had promised him that so far as notes came to it for collection it would arrange for the payment of same, and hold the collateral to protect itself, and he urged that the defendant do the same thing in regard to this note. This, the defendant told him it would not do; that it must insist that he pay the note. The plaintiff had no knowledge of this purported sale on the 31st of December, other than the notice given to him on the morning of that day, that unless the note was paid that day the collateral would be sold. And the plaintiff prior to the 31st of December, said to the defendant that he hoped if the stock was sold there would be no publicity about it, as he feared the effect on the market value of the stock and upon his credit if it should be publicly known that this collateral was being sold.

The plaintiff says in his testimony, that the first knowledge he had of this sale was communicated to him by the president of the defendant on the 14th of January, 1902; that he was then told by this president that they had sold the stock to themselves, and had paid the note to the trust company, and would hold this collateral as security to themselves for the payment they had made and for the other indebtedness of $78,000 which plaintiff then owed to the defendant. This conversation the president of the defendant denies, and we are not prepared to say that the plaintiff sustains by preponderance of the evidence that this conversation took place, as he relates it. But in this opinion we treat the matter as though the plaintiff had not so testified. We think he is as likely to be mistaken about his remembrance of this as the president of the defendant. But, however, we do find that on the 5th of February, 1902, the defendant transmitted by mail to the plaintiff the note which it had paid to the trust company in Philadelphia, which was canceled as "paid" on the 31st day of December, 1901, and that such cancellation was stamped upon the note upon the date last named. The plaintiff acknowledged by letter the receipt of this note so canceled. Beyond that there was no communication between the plaintiff and the defendant in reference to said note until June

4, 1902, while the defendant still held the said collateral, when the plaintiff sent to the defendant, by mail, a draft drawn for him or by Mr. Charles Ashbrook for $37,500, and by letter accompanying said draft advised the defendant that he had sold the 500 shares of Detroit United Railways stock which it was carrying for him, and that this draft was in payment therefor. In this letter he requested the defendant to apply the proceeds of this draft on his indebtedness to the bank. The defendant immediately notified the plaintiff that it claimed to own said stock; that it had purchased the same on the 31st day of December, 1901, and denied all right on his part to any interest in the stock.

Thereafter, partly in the month of June and partly in the month of July, 1902, the defendant sold said stock for $40,000.

This suit was brought on the 9th of April, 1906. Before that time the plaintiff had fully paid to the defendant all of his indebtedness to it other than that connected with this note, being the $78,000 hereinbefore mentioned. The plaintiff claims, that he is entitled to the full amount received by the defendant on the sale of this stock, less the amount necessary to reimburse it for its payment to the trust company at Philadelphia. The defendant denies that under the facts the plaintiff is entitled to any recovery, but insists that by virtue of the purported sale of December 31st it became the absolute owner of this stock, and the defendant further pleads, that in any event more than four years elapsed after its appropriation of this stock as its own before any suit was brought, and that more than four years elapsed after the plaintiff had knowledge of its claim that the stock belonged to itself, because it says that the plaintiff was bound to take notice of that fact, if not before then on the day that he received from the defendant the canceled note which it had paid to the trust company in Philadelphia; and that the plaintiff is therefore barred by the statute of limitations from prosecuting this action.

Many additional facts were developed in the trial of the case, but we regard those already stated, with a proper application of the law to them, as decisive of the case.

But for the statute of limitations the plaintiff is entitled to recover, unless by the purported sale of the stocks on the 31st

of December, 1901, the defendant became the absolute owner of this stock, either because the sale alone transferred the ownership, or because the same was ratified by the plaintiff when he came to know of it, for even if the sale did not confer a complete title when it was made, the title might become complete by ratification of the plaintiff after knowledge of it came to him.

It becomes necessary then to consider whether the sale in and of itself transferred the title to the defendant. It is too well establish to require the citation of authorities or any process of reasoning, that except where authority is expressly given for that purpose, the pledgee can not be the purchaser of the pledged securities, either at public or private sale. The language of the note which it is claimed authorized the purchase here has already been quoted, and is here repeated:

"I, —————— upon default of payment at maturity do hereby authorize ——————, the holders hereof * * * to sell the whole or any part of such security * * * at any time thereafter, with the right on the part of such holders to become purchaser and absolute owner thereof, free of all trusts and claims."

It will be noticed that this authority to purchase is given only to the *holder* of such securities. The sale was made, not to the pledgee, but to an agent of the pledgee, whose only interest in the matter was to obtain payment of the note. The purchase was made not for the pledgee, but for the agent in its own right. Was the defendant the holder of the note in the sense in which that word is used in the clause of the note quoted? We think not. *Parsons, Notes & Bills*, Section 253, reads:

"By the holder of negotiable paper is meant in law the owner of it, for if it be in his possession, without title or interest, he is in general considered only as the agent of the owner."

Daniels in his work on Negotiable Instruments, Section 716, defines the holder of a negotiable instrument as:

"Anyone who has acquired it in good faith for a valuable consideration from one capable of transferring it."

Surely the agent with whom the note had been left for collection, and to whom the securities had been delivered, for, sale, if necessary to secure the collection, except he be the *holder* of the securities as we have said the defendant was not in this case,

could not, either as against the pledgee or the pledgor, become the purchaser at the sale made by such agent. *Mecham on Agency,* Section 68 reads:

"For the same reason, one can not be both the party and the agent for the opposite party in the same transaction. Thus, as will be more fully explained hereafter, except with the full knowledge and consent of his principal, an agent appointed to buy lands or goods for his principal can not buy of himself; and an agent to sell lands or goods for his principal can not sell to himself, nor can an agent authorized to receive payment for his principal bind the latter by the receipt of money due from himself."

And so we hold that the defendant did not become the owner of these stocks by virtue of the purported sale of December 31, 1901.

Under the facts, as stated, the only knowledge the plaintiff had of what the defendant had done with the securities was obtained from the delivery of the canceled note to him by the defendant on the 5th day of February, 1902. From that fact he did know that the defendant had paid his note, and we of course knew that it still held the collateral.

Of course, if the defendant had, as a volunteer, paid the debt of the plaintiff to the trust company of Philadelphia, the plaintiff was entitled forthwith to the delivery of the stock to him, and might have made demand at once for such delivery, treating the further holding of the collateral as a conversion then made, and if he delayed making such demand beyond the period of limitation fixed by the statute he would be barred. In view, however, of the fact that he had requested the defendant to pay the note for him and retain the securities for its own protection, although the defendant had notified him that it would not do so, yet when he found that it had paid the note, and still held on to the collateral securities, he would have been and should have been defeated, if he had brought an action for the delivery of the stock to him, or an action for the value of the stock, on the ground that the defendant had converted the same to its own use. The most favorable construction to the conduct of the defendant which the plaintiff could have given, he being ignorant of the purported sale on the 31st of December, was that which his con-

duct indicated that he did give, to-wit, that the defendant had complied with his request to pay the note and retain the collateral for its own protection.  In short that it—''Vowing it would ne'er consent, consented.''

It is said that this is the most favorable construction which the plaintiff could give to the conduct of the defendant because to have given any other construction would have resulted, if such other construction was justified, in depriving the defendant of the protection afforded by the retention of these stocks.  If the plaintiff was justified, as we think he was, in giving the construction to the conduct of the defendant first suggested, then there was no ratification by him of the purported sale, because he knew nothing of it; nor was there any conversion, actual or constructive, by the defendant until the date in June, 1902, when the draft was presented to the defendant and was notified that the defendant claimed the stock as its own.

See *Glidden* v. *Bank,* 53 Ohio St., 588, the second and third paragraph of the syllabus of which read as follows:

''2.   If the pledgor do not so elect, the pledgee, while he retains the possession and control of the property with the ability to perform his part of the contract by restoring the property to the pledgor, can not be held for its conversion, without demand for its return accompanied with an offer by the pledgor to perfrom his part of the agreement.

''3.   When, however, the pledgee puts it out of his power to perform his part of the agreement, by an unauthorized disposition of the property, he will be liable for its conversion without demand and offer of performance by the pledgor; and when he has so disposed of a part of the property, he may be held for the conversion of all of it as of the time of such disposition.''

Again, upon principles of equity, the defendant may be held as holding this stock as trustee for the plaintiff after the payment of this note, and so not liable for its conversion, until it actually parted with it by sale in June and July, 1902, or in any event until it notified the plaintiff in June that it claimed to own the stock and denied that he had any right to it in the absence of any contract about it.

For a discussion of this view see:  *Bispham's Principles of Equity, Section* 91 and following.

After a discussion of the principle in Sections 91 and 92 this writer says in Section 93:

"The rule under discussion applies not only to persons standing in a direct fiduciary relation towards each other * * * but also to those who occupy any position out of which a similar duty ought in equity and good morals to arise."

It seems clear to us that in good morals, the defendant should have held this stock for no purpose but to indemnify it for the payment made to the trust company, and that it may well be held, therefore, to have held this as trustee, in which case, so long as it held it, the plaintiff had no right of action against it until he tendered payment of the amount of his debt, and hence was not barred in his present action by the statute.

This principle is stated in the case of *Carpenter* v. *The Canal Co.,* 35 Ohio St., 307, at page 317, as follows:

"The court will sometimes make use of the machinery of a trust to aid an injured party in obtaining property, the title to which has been acquired by another by fraudulent means. * * * Relief in such case is granted on the ground of fraud and the statute of limitations will not be a bar where there is concealment."

The third paragraph of the syllabus in this case reads:

"An action for wrongfully depriving a mortgagee of his security is barred in four years, whether such action is for a tort or for relief on the ground of fraud by charging the guilty party as trustee. In the former case the action is deemed to have accrued at the time of the injury, in the latter case, on the discovery of the fraud."

*Perry on Trusts,* Section 168, discusses constructive trusts, and includes among them "trusts that arise from constructive fraud," and says that:

"In this class the conduct may not be actually tainted with moral fraud or evil intention, but it may be contrary to some rule established by public policy for the protection of society. Thus a purchase made by a guardian of his *ward,* or a trustee of his *cestui que trust,* or by an attorney of his client, may be in good faith, and as beneficial to all parties as any other transaction in

life, and yet the inconvenience and danger of allowing contracts to be entered into by parties holding such relations to each other are so great that courts of equity construe such contracts *prima facie* to be fraudulent, and they construe a trust to arise from them."

And in Section 167 of the same work, it is said:

"It is not, however, the rule that the court will presume or construe a trust to arise except in cases of absolute necessity; for courts of equity will act upon the just preponderance of all the facts and circumstances of proof in the case."

While it is not supposed that the defendant did that which it understood to be a fraud upon the plaintiff, especially as the evidence fails to show that the price it assumed to pay was not fully as much as could have been obtained from any other person, yet in holding on to this stock, under the purported sale of December 31, 1901, it did that which in legal effect worked a fraud upon this plaintiff, if it was done without his knowledge or consent; and we hold that though he knew that the defendant was holding on to the stock, yet if he understood and had a right to understand that such holding was simply to protect itself for the payment which it had made to the trust company, his making no claim or protest about it did not constitute a consent on his part to its holding such stock under the purported sale. The result would be that the statute of limitations did not begin to run against him until he was notified in June, 1902, of the claim of the defendant under such purchase.

The result is that we find the defendant did not become the owner of the stock, by the purported sale on the 31st day of December; that such sale was never ratified by the plaintiff. That the only justification for the defendant in holding this stock, after it had paid the note to the trust company, was to protect itself from loss on account of such payment, and that because in doing so, it was complying with what the plaintiff had requested it to do. That it was not complying with the terms under which it held the stock when it sold the same in June and July, 1902, and that the plaintiff is entitled to an accounting and to a recovery for the amount received for the stock,

with interest thereon, after deducting therefrom the amount paid by it for the plaintiff to the trust company, with interest thereon, and an order is made accordingly.